Thank you, Your Honor. Good morning. Bill Blair, representing defendant appellants. We're here on an interlocutory appeal from denial of a motion for summary judgment based on qualified immunity in a discrimination case. I want to focus primarily on the second prong of the qualified immunity test, that being the clearly established law portion of it. But I don't want to do so at the risk of marginalizing what I think is the primary or threshold question is, was there ever a constitutional deprivation in the first place? Throughout my remarks and responses to any questions you might have this morning, please understand that I have to approach this, and I believe the Court should, from the standpoint of identifying particular defendants rather than looking at a clump of defendants, some of whom are before this Court as appellants and some are not. In this case, we have two defendants only, that being Mr. McKelvin and Ms. Harris. They had a statutory role to perform, that statutory role being advocacy for veterans of the armed services of the United States, among other things, bringing claims for service-connected disabilities. In doing that, as veterans service officers, they had considerable breadth of observation of the various claimants that in the Portland Veterans Administration process. The claims made by the plaintiff assert that Mr. McKelvin and Ms. Harris discriminated against her for two reasons or on two bases of invidious discrimination, one being her ethnic background and the other being her gender. The defense is, quite simply, these veteran service officers were advocating for clients, for service among other clients, a number of whom were veterans of Asian and Pacific theater combat, Vietnam, Korea, even World War II. Counsel, in the context of Title VII cases, it has long been held that customer preference is not a valid basis for an employer to bow to that if it is discriminatory. And the classic cases were in the South, in the old days, where people said, well, we don't mind African Americans, but our clients just won't accept that. Why isn't it well established that that is not a valid basis for an employer's decision-making if it is discriminatory or the gender of the individual? There are two problems, at least two problems, with that analysis, Your Honor. The first being, this is not a Title VII case. Neither Mr. McKelvin nor Ms. Harris nor Washington County was the employer of Dr. E. She was not the employer honoring some kind of customer preference. Second, the necessity of the function that Dr. E. was providing was that of examining veterans who were claiming post-traumatic stress disorder, psychic injuries, as a result of their service. And it's not just a preference, it is an actual, insurmountable impediment for many veterans who have been involved in Pacific circumstances that resulted in their claim of PTSD to someone who may simply psychologically trigger a very negative, adverse response. But I think you cannot say that the VA can't hire Asian women for these roles, period, which is the part of the advocacy made in this case. And I don't want, I'm not losing track of any of your defenses. I'm just focusing on a I realize that there are other aspects involved here. But the VA couldn't possibly say, would you agree, that no Asian women can apply for these positions, even if we have the circumstance where we're in combat, those who experienced combat in Vietnam and other places, right? Absolutely, 100 percent agree with that, Your Honor. And certainly nothing that either Mr. McKelvin or Ms. Harris did was either intended to nor had the effect of putting the Veterans Administration in a position of not hiring Asians or women to perform PTSD. But your clients did, in a sense, advocate that Asian women not be assigned to Vietnam, treatment of Vietnam vets with post-traumatic stress disorder, true? Yes, that is true. I take it your position would be that there's a clinical impediment to rendering the psychological services in the circumstance of a Vietnam vet and an Asian psychiatrist or psychologist. And the same impediment does not exist, nor does the record disclose any case in which either of the defendants attempted to preclude Dr. E from performing PTSD exams on Middle Eastern theater vets, European theater vets, Grenada vets, because those situations did not apply. It is a very specific clinical issue. Right, but in the real world, it's a case-by-case basis analysis. Sometimes you might have a trigger and sometimes not, true? True. Even with, you can't say as a blanket statement that Vietnam vets can never be treated by Asian women? True. But that was the advocacy. Don't allow Asian women without combat experience to treat Vietnam vets with PSTD. Respectfully, I must disagree, Your Honor. There are a couple of parts of this puzzle. Actually, there are three parts of this puzzle. Part number one, there were veterans who did come back and complain. True. And as a result, defendants did attempt to prescreen vets that were being assigned to PTSD exams in Portland, finding out, recognizing that there will be an Asian woman who is performing some but not all of the PTSD exams for the Veterans Administration, recognizing that, do you feel that you will have a problem? If you do, you need to let the Veterans Administration know that and ask not to be assigned to that person. Okay, that's another component. Third component has to do with what I'll call bedside manner or the way in which Dr. E conducted exams, and that's really not gender or ethnicity specific. No, but isn't there a factual question whether that indeed was the reason for what happened here? Because there's at least one statement in deposition by Dr. Tuck-Schmidt that ethnicity was a thread throughout the conversations, mostly but not exclusively related to the issues that you're now talking about. So I guess I'm looking at it from the point of view of the procedural posture of the case. You might well ultimately be right that there were issues of performance unrelated to protected categories, but isn't there some evidence that at least ethnicity was a factor throughout? Dr. Tuck-Schmidt may have said that, and that may have been his perception, but what the record discloses as far as the defendants, and I'm restricting again strictly to McKelvin and Harris, is that their perception of performance issues had to do, and there were very specific instances that they brought to the attention of Dr. Tuck-Schmidt. Whether he recognized this or not, I can't speak for him, but there was, for example, a case in which a veteran had brought his wife to the exam, which is perfectly permissible under VA regulations, and in the course of the exam, Dr. E ejected the wife or asked the wife to leave. There's another example in which a veteran was answering questions on a written interview form, hadn't completed it, the interview started, Dr. E looked at it and said, don't bother filling in the rest, I'll do that for you. And was, at least by that veteran, perceived to be abrasive and not paying attention to what he had to say. Oh, that's true in the record, but we're not here after a trial, we're here on summary judgment. So I recognize that evidence, and I recognize, of course, that if it proceeds to trial, you're going to vigorously defend and point those things out. But I think the difficulty on summary judgment is that if that were it, it would be a different story. But there is a component throughout this that's emphasized, she's Asian, she's a woman, and that's why she should be fired along with other reasons. And if that's the factual dispute, then a jury needs to sort that out. Please, Your Honor, do not use or think of this case in terms of she should be fired. Neither of these defendants ever suggested that. Well, the letter that was not sent to Senator Smith was pretty strong. The letter that was not sent to Senator Smith was folded into the cover letter that Mr. McKelvin wrote that was far more extensive. And I think it's very important that what came from these defendants to Dr. Tuchschmidt was not get this woman fired, it was get this woman some additional training in how to perform PTSD exams. Well, it's a little broader than that. It says, appointing an Asian woman with no basic military understanding is an unfair situation to place a veteran into. And the letter goes on to talk about, I mean, and Ms. Harris does say, she realizes it's a sensitive situation as a woman, I understand that. But basically, it just says a woman with no military or combat experience of Asian descent shouldn't be conducting interviews of PTSD vets in the Vietnam arena. So it's more generic. And I'm not saying that there aren't other factors here. I'm just saying, is there enough to get two jurors? That's the only question in front of us. Well, but again, and not to belabor the point, because I think the most important thing, and I'm down to less than a minute and a half. The important thing is the clearly established law prong of it, and I believe that's really where the district court erred most emphatically in its opinion, was to simply make the broad generalization that discrimination on the basis of race or sex is a bad thing, and therefore there was clearly established law that what these people were doing would be unconstitutionally discriminatory, and yet in the same opinion find that there was no defamation under Oregon law because there was, in fact, a privilege for these people to make performance-based criticisms to the employer, the Veterans Administration. The last point, really quickly, is that of causation, because Dr. Tuchman clearly indicated he never saw, paid attention to, or considered Mr. McKelvin's letter, Ms. Harris's letter, a year and a half later when he made the decision not to renew Dr. E's contract. Thank you. Thank you, counsel. We will give you some time for rebuttal. Thank you. May it please the Court. Jonathan Oster, representing Plaintiff Apolli in this case. Your Honors, the first issue I think you recognized is that there's no jurisdiction to go back and review the district court's finding that there were genuine issues of material fact here present. There's plenty of evidence to get to a jury or trial in this matter with respect to the factual disputes on the record. The case law – Would you mind starting with the last point counsel made, which is what are the issues of – what are your best issues in the record of material fact, or the issues that you believe show causation? Well, Your Honor – And obviously reviewing the facts in the light and most favorable to your client. Correct. But what are the facts in the record as you would construe them that would prove causation, or at least create a tribal issue of fact on causation? Your Honor, so we're focusing specifically on the two Washington County defendants here. Yes, they're the only ones. McKelvin and Hill. And yet – and certainly I understand counsel's position of trying to separate those defendants from the other individual defendants in this case, defendant Johnson and Grooms. And yet, because we have a Section 1985 claim alleging conspiracy, and because we have evidence of concerted actions, and we have e-mail exchanges and phone conversations and records, they're all packaged together. And in fact, the cover letter that you referenced by Mr. McKelvin, which included the letter Ms. Harris directed to Senator Smith that was never sent, specifically references conversations with defendant Johnson and specifically references concerted discussions between CVSOs throughout the state and their attempts to influence the C&P Department, which used to be in Vancouver and is now in Hillsborough, the staff of that C&P Department to have the plaintiff marginalized and removed. And so from a factual perspective, encouraging veterans to make complaints, encouraging other veteran service officers, whether it was a national or a county, to make complaints, making complaints themselves directly to the PVA MC, all had the effect of influencing the VA to not renew a plaintiff's contract. And actually, before the non-renewal, she was marginalized in her scheduling. So it actually took effect. The influence, the effect occurred prior to the contract being up for renewal. With respect to the causation, very specifically, the record has, I think the parties disagree about who made the decision to non-renew a plaintiff's contract. And certainly, Dr. Tuchman, who was the acting director of the PVMC at the time, had the authority and was the final decision-maker of that respect. He testified that he had very little to no role in it. He delegated that authority to Connie Smith, who was the head of the PVA MC C&P office in Vancouver where plaintiff worked. And she was the one who received those direct phone calls. Her and her staff were receiving those phone calls from the CVSOs, from veterans, from other national veteran officers trying to have plaintiff removed. And she was the one who made the decision. Even though Dr. Tuchman, his testimony is very clear, specifically ordered her to investigate the veracity of the claims, Dr. Tuchman understood that you can't make a decision based upon a racial or ethnic or gender bias without ensuring, at the very least, that there was a factual performance-based issue underlying these complaints. That determination was never made. Connie Smith made the decision to non-renew plaintiff's contract absent of any factual determination about performance, solely based upon the amount, the sheer volume of complaints she was receiving. And the record is replete with evidence that shows that a lot of these complaints were generated by the CVSOs. There is no clear indication, and certainly this is something that we'll be arguing at trial, as to whether these complaints that were supposedly came about by the veterans themselves were actually not, in fact, insinuated by the CVSOs. If I can summarize, I think your argument is that you, I'm gathering by the absence, you're conceding that there's no direct connection in the sense that these defendants caused the termination by sending a letter. But what your argument is is that by a series of concerted actions with others that that resulted in the termination. Is that the posture you want us to take the case in? It is not, Your Honor. All right. In fact, there is evidence that these specific defendants did take actions that had the effect of influencing the staff within the PVAMC, within the C&P office, the Compensation and Pension Office. The letters may have not been considered by Dr. Tuchman, but the staff at the C&P department that oversaw plaintiff's work and her schedule and her contract were aware of them. They were aware of the verbal beratement of Dr. Tuchman and staff at the Oregon DVA conference, of which, of course, CVSO Johnson, who was the defendant from Benton County, was the most vocal and the initiator, but that the record, the evidence is uncontroverted that Defendants McKelvin and, in fact, Harris were also involved in discussions with Dr. Tuchman's assistant subsequent at the same meeting, but after Defendant Johnson stormed out of the room, because he was so agitated. I could probably summarize a little too, but, I mean, you're not claiming in this case that there, for example, they got on the phone with Tuchman and said, fire this person, and it was fired. It was a series of events that occurred. That's your theory. That is correct. And the other point that counsel made that his clients never intended plaintiff to be fired or non-renewed. In fact, they wanted her to have more training or reassigned or what have you. A plaintiff's position is, first and foremost, that there's little difference in terms of the effect on her employment and on her damage, her injury. But, secondly, that, in fact, when Defendant Johnson initiated the concerted action, the conspiracy with an email to other CVSOs and said very clearly, I believe she's trying to sabotage veterans. I want her fired. Defendant McKelvin responded to that email and said, I have problems with this CVSO also. Would you agree that it's within the statutory duty of a CVSO to report upward, if you will, concerns and complaints of veterans? It is. It is statutory duty that they should report concerns that are originating with veterans. Is there any evidence in this record that either McKelvin or Harris fabricated a complaint or concern on the part of a veteran in making those reports? Fabricated would – there is no evidence that they fabricated a complaint itself. What there is evidence of is that they exaggerated the number of complaints, that they influenced, attempted to influence the veterans to be biased against plaintiff herself by telling – by screening the veterans in advance for bias and by telling the veterans, go record your exam. McKelvin actually had a conversation with another CVSO saying, what about having the veterans go in with a tape recorder so we can tape recorder exams? They were trolling. They were fishing for dirt to try to actively have her removed. Assume that a CVSO has a good faith belief that being treated by an Asian woman would cause a clinical impairment to the rendering of psychological services. Is the CVSO engaging in discriminatory conduct by so advising a veteran? By advising the veteran or by advising the VA? First the veteran. I mean, part of your argument is that the CVSOs gave veterans directives, don't do this, don't do that, whatever. Correct. But suppose a CVSO has a good faith belief that there is a clinical impediment to the rendering of services by the psychiatrist. If the CVSO says that to the veteran, is the CVSO engaging in discriminatory conduct? If the CVSO believes the veteran has a good – the CVSO has a good faith belief that the veteran is not able to get treated adequately by the doctor, the CVSO could inform the veteran that there are steps that they can take to request a different examination. And this goes to Your Honor's point earlier that there cannot be a blanket policy that – That was a question, not a point. I'm sorry? That was a question, not a point. Correct. I think this speaks to the same issue, is that the VA actually had a mechanism for exactly this type of situation. The VA allowed in certain case-by-case situations veterans to be seen by a different doctor. They allowed that on very specific cases. And so there was a mechanism for exactly the type of hypothetical situation that you're asking. However, the district court found that the CVSOs went well above and beyond that limited advocacy. But what did these two – what did these two CVSOs do that was above and beyond? I understand your conspiracy point, but what did these two individuals do? These two individuals screened veterans in advance for bias. So your hypothetical is the veteran says – or something occurs originally with the veteran that indicates – that gives the CVSO the good faith belief that there is, in fact, perhaps an impediment to adequate treatment and adequate examination. And, in fact, what the CVSOs did in this case is they were the ones that originated the idea, the concept, that, in fact, there could be a problem here. But what's wrong with that if, in general, in terms of having some understanding of the mental condition of veterans, why is that wrong for the CVSO to initiate it in the first instance, even if a particular veteran doesn't come and say, you know, I have a problem with Asian women? It poisons the well, Your Honor. And for the very same reason – Poisons the well or is prophylactic? I'm sorry? Poisons the well or is prophylactic? Both, I would say, Your Honor. And the reason – and the reason this is an issue is because Plaintiff treated over 1,300 veterans during her tenure with the VA. We're talking about two, three, maybe a half dozen actual cases where a veteran is upset and there's factual disputes about whether those complaints originated spontaneously with the veteran or whether they were, in fact, influenced by the CVSO. I mean, we're talking about a fraction of a percentage of the overall cases that she treated. And so I think what the record shows, the evidence shows, in fact, that this is not some widespread problem, that we're using a bludgeon when, in fact, the VA has a mechanism for a scalpel. Right? There is – Perhaps. But, you know, the odd thing about this – well, the interesting thing about this case is it involves some individuals who are charged with statutory advocacy. And they are charged with being sympathetic to what veterans say about performance. And within that role – I think this is a larger question that counsel was – a point that counsel is making at the end – they have some license to report problems, even if those problems may seem racially tinged. I mean, that's – if veterans are having problems being treated by Asians because they've worked in the Pacific Theater, then don't you think that's permissible to discuss that with the VA? The district court – Judge Haggerty actually addressed this very issue. And in his opinion, he understands that, in fact, there was a statutory duty, that the individual defendants met that statutory duty and then went above and beyond. And it was really that active above and beyond – those actions that they sought to undermine plaintiff's employment that create that liability. Would a reasonable CVSO understand that those above and beyond activities were not reasonable in terms of the existing state of the law discrimination? Absolutely. And I'll just point to two things, Your Honor. Well, the first really is some evidence that we just touched upon during counsel's argument, which is that the letter that was addressed to Senator Smith, written by Defendant Harris that was included in that package, she testified at her deposition that she didn't want to write the letter, that McKelvin instructed her to write the letter and directed her to, but she didn't want to write it because she knew that she'd be getting herself into trouble. She knew that it wasn't okay to say that this doctor should not be allowed to do her job because of her race and her gender. She knew that there was a problem with that, that it violated some type of fundamental law. And I think the court, district court, certainly had no trouble with addicts, that no principle of law is perhaps more clearly established than the right to be free from discrimination on account of race and gender, particularly with respect to somebody's employment. So a reasonable official would know that I have a statutory duty to report, and I'm going to report. And then the VA has a duty to either do something about it or not. And, in fact, the VA was – they did do something about it. They internally investigated Plaintiff's work and found it to be exemplary. Exemplary. Or paperwork. Well, her reports, the substance of her reports. Now, they did not – they were not able to, and they made the decision not to go back and reinterview dozens of veterans, perhaps, perhaps dozens, perhaps less, to determine whether there were perhaps factual disputes. The veteran was saying something, she was recording another thing. They chose not to do that. But they didn't see any indication, given the substance of reports, that there was an issue, given the fact that she had been examining over 1,000, 1,300 veterans. Well, let's assume for the sake of argument that your client were – if your client were a white male and all this had happened, and they said this person is rude, et cetera, et cetera, you could see that CVSOs can say to the VA, I think you ought to fire this person and not renew the contract, right? You know, it's interesting you bring that up, Your Honor, because, in fact, there is evidence that Plaintiff introduced into record on summary judgment that we will, you know, advocate for a trial that, in fact, there were significant complaints against white male doctors because of their rudeness, because of – Right, but I'm asking a hypothetical. I'm not getting what you're saying. No, but I understand. The point being is that there were complaints about that, and nobody said you should fire this person. But my question was rather that there's no case here if the CVSOs are advocating for the rightfully or wrongfully of a dismissal or a non-renewal of a contract of somebody if there isn't a component of discrimination, right? Of course. That's a constitutional violation. Yes. Yeah. Absolutely. So in my minute that I have left, Your Honor – Well, I'm over it. You're right. You're right. It's going up. I'm going to ask other questions from the panel. All right. Thank you. Thank you, counsel. Where to begin? Again, I'm struck with the concept that Plaintiff's case seems to depend on conflating all of the veteran service officers into one lump and then using that one lump as a surrogate for McKelvin and Harris. What's wrong with that on a conspiracy theory? What's wrong with that on a conspiracy theory is that if you can't get to a conspiracy, it's wrong. And in this case, there is no evidence to get you to a conspiracy. The evidence that the plaintiff points to is a series of e-mails to which – that were addressed in part to either Harris or McKelvin or both, none of which they replied to. And so to say, hey, you read a newspaper story or you got a mass e-mail to a bunch of people on a list serve or you got an e-mail to a bunch of friends and you now somehow become one with everything that the other friends or the other people on the list serve are advocating, and that's simply not correct. Counsel points to issues of material fact that really are not. He mentioned that McKelvin or Harris apparently were encouraging national veteran service officers. Well, one of the things I didn't mention in opening is that by the time Dr. Tuchman said that he made the decision to not renew Dr. E's contract, he had been receiving complaints from congressional delegations, from national veteran service organizations like the American Legion, Disabled American Veterans, and so forth, and that it was the sheer number of complaints that he was receiving that led him to the decision not to renew her contract. That was a year and a half after a letter that he said he never recalled even reading. Connie Smith, if she in fact made the decision, then certainly there is no evidence in the record because there's no evidence in the record that Connie Smith read this letter from McKelvin or the letter from Harris. There is no evidence in the record that Connie Smith ever talked to McKelvin or Harris. There is no evidence in the record that any of her immediate subordinates, Ms. Poore, Ms. Satterfeld, Ms. Zatola, ever talked with McKelvin or Harris. I'm not quite sure what counsel means by exaggerating the number of complaints because Dr. Tuchman at one of the YAHATS conferences said to Mr. McKelvin, Don't give me generalities, give me specifics. And so Mr. McKelvin came up with some specifics. The records of those veterans are certainly health records and they are private and we have not chosen to go into any great fishing expedition to see how many people were unhappy with Dr. E. But what Mr. McKelvin did testify to is that in his view of the experience with Dr. E versus other providers, the number of veterans whose cases were being overturned on appeal at the appellate level within the VA was much higher. And that's what got him started in trying to figure out what the heck is going on here. Thank you, counsel. Your time has expired. If you want to make one last point, I'll let you. Yes. Please bear in mind that Dr. E. never treated any vet. These were all examinations for the purpose of the Veterans Administration. She was not a treatment provider. Thank both of you for your arguments today. The case I just heard will be submitted for decision and will be in recess for the morning. Thank you.
judges: Selna, Thomas, Graber